IN THE DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

CASE NO. 4:09cv01384-WOB

SAMUEL NATHAN FREELAND                                                PLAINTIFF

VS.                            **MEMORANDUM OPINION
                                AND ORDER**

TROOPER JONATHAN SIMMONS
And
CORPORAL JOSEPH DORIO                                                 DEFENDANTS

**BERTELSMAN, Senior District Judge:**[1]

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 28). The Court heard oral argument on this motion by telephone on January 6, 2012 and thereafter took the motion under submission. (Doc. 68). The Court now issues the following Memorandum Opinion and Order. For the reasons that follow, Defendants' Motion for Summary Judgment will be granted.

### FACTS

This lawsuit arises from a traffic stop and Plaintiff Samuel Freeland's ("Freeland") subsequent arrest for driving under the influence ("DUI") in the early morning hours of November 29, 2008. Earlier the previous evening, Freeland and his wife had a fight, and after his wife and his children were in bed, Freeland decided to meet some friends at Remedies, a

---

[1] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

local bar. (Doc. 65-1, Freeland Depo., at 14-15). Freeland admits to having three beers at home, as well as two or three mixed drinks and one beer while at Remedies.[2] (*Id*. at 17).

Mrs. Freeland later awoke and discovered that her husband was not at home. (Doc. 65-2, Dedi Freeland Depo., at 12). After several unsuccessful attempts, she eventually reached Freeland and learned he was at a bar. (*Id*.). Based on the way he spoke, Mrs. Freeland assumed he was intoxicated. (*Id*.). She then accused Freeland of being irresponsible and expressed concern that he would be driving while intoxicated and could get a DUI. (*Id*. at 13).

After the conversation ended, Mrs. Freeland contacted the Horry County Police Department dispatch and asked to speak with Officer Scott McCarthy, whom she knew from South Strand Ambulatory Care Center, where she worked as a nurse. (*Id*. at 9, 13, 27). When dispatch informed her that Officer McCarthy was not on duty, she asked to speak with Corporal Joseph Dorio ("Dorio"), another officer she knew from her employment. (*Id*. at 14). She provided the dispatcher with her telephone number and asked that Dorio contact her. (*Id*.).

Dorio was on patrol that evening with a trainee, PFC Christopher Peterson. (Doc. 28-4, Dorio Aff., at ¶ 2). The dispatcher contacted Dorio through his in-car laptop computer and relayed the message that Dedi Freeland had asked that Dorio call her. (*Id*.). Unfamiliar with the name, Dorio blocked his cell phone number and called the number provided by dispatch. (*Id*. at ¶ 3). After identifying herself and how she knew him, Mrs. Freeland informed Dorio that her husband was intoxicated at a bar and would likely be driving home. (Doc. 65-2, Dedi Freeland Depo., at 14-15); (Doc. 28-4, Dorio Aff., at ¶ 4). She specifically requested that Dorio find

---

[2] Freeland testified that these drinks were consumed over a six to seven hour period. (*Id*. at 17).

Freeland and arrest him for driving under the influence.[3] (Doc. 65-2, Dedi Freeland Depo., at 14-15).

Dorio explained the financial consequences of a DUI arrest and suggested various alternatives, but Mrs. Freeland pressed the DUI complaint. (Doc. 28-4, Dorio Aff., at ¶ 5); (Doc. 65-2, Dedi Freeland Depo., at 14-15). Dorio responded that he would investigate. (Doc. 28-4, Dorio Aff., at ¶ 5).

Dorio proceeded to Remedies Bar and parked in plain view near Freeland's car, hoping to deter Freeland from driving. (*Id.* at ¶ 6). This attempted deterrent was unsuccessful, and when Freeland left the bar, he eventually drove north on the Highway 17 Bypass. (*Id.* at ¶ 7); (Doc. 65-1, Freeland Depo., at 17). Dorio began following the vehicle, and Freeland quickly pulled into a McDonald's drive-through line. (Doc. 65-1, Freeland Depo., at 17); (Doc. 28-4, Dorio Aff., at ¶ 6). To maintain sight of the vehicle, Dorio pulled into an adjacent parking lot. (Doc. 28-4, Dorio Aff., at ¶ 6). Freeland did not stay in line long and left without ordering any food. (Doc. 65-1, Freeland Depo., at 34). Dorio continued to follow him, keeping in contact with Mrs. Freeland.[4] (Doc. 28-4, Dorio Aff., at ¶¶ 8-10).

---

[3] Mrs. Freeland testified that she was angry with her husband and was considering a divorce. She wanted him to be taught a lesson and believed that the arrest would allow her time to get her affairs in order and begin the divorce process. (Doc. 65-2, Dedi Freeland Depo., at 15).

[4] The parties appear to dispute how many calls and texts occurred between Dorio and Mrs. Freeland and who continued to initiate the communications. However, it is undisputed that Mrs. Freeland originally contacted the Horry County Police Department and requested that Dorio contact her. It is also undisputed that Dorio and Mrs. Freeland remained in contact throughout the events. Accordingly, who initiated the calls is irrelevant to the instant matter, and any dispute as to such is not material.

At some point, Freeland allegedly sent his wife a text message, which stated something along the lines of "cute trick—your cop friends are dumb." (*Id.* at 30). Mrs. Freeland relayed this message to Dorio, and testified that she believed after hearing that, Dorio was "a little more determined to make things happen . . . as far as an arrest." (Doc. 65-2, Dedi Freeland Depo., at 42).

Although the parties disagree as to several intervening events, they agree that Freeland ultimately went to the Sun Up, another local bar.[5] (Doc. 65-1, Freeland Depo., at 20, 35); (Doc. 28-4, Dorio Aff., at ¶ 11). Dorio parked across the street and contacted Trooper Jonathan Simmons ("Simmons") with the South Carolina Highway Patrol for assistance. (Doc. 28-4, Dorio Aff., at ¶ 11). Simmons, unlike Dorio, was fully certified to conduct a breathalyzer test and was a member of the DUI task force.[6] (*Id.*). Upon his arrival, Dorio informed Simmons of a suspected intoxicated individual driving a white SUV. (Doc. 28-5, Simmons Aff., at ¶ 2).

Shortly after Simmons met with Dorio, Freeland left the Sun Up bar, and Simmons began following him, with Dorio following behind him. (Doc. 28-4, Dorio Aff., at ¶ 12); (Doc. 65-3, Simmons Depo., at 8). Simmons averred that he observed Freeland weave out of his lane, at which time he activated his dash camera. (Doc. 28-5, Simmons Aff., at ¶ 4). Simmons then saw Freeland fail to signal when turning into his subdivision, prompting Simmons to turn on his blue lights to initiate a traffic stop. (*Id.* at ¶¶ 4-5).

Freeland did not stop his vehicle until he pulled into the driveway of his residence. (*Id.* at ¶ 5). He asked Simmons why he had been stopped, and Simmons responded that he saw Freeland swerve into the other lane and wanted to make sure that he got home safely.[7] (Doc. 65-1, Freeland Depo., at 23). Although Freeland contends that he did not give Simmons any reason

---

[5] The record does not reflect how long Freeland was at the Sun Up, but he testified he left after playing a game of pool and finishing his beer. (Doc. 65-1, Freeland Depo., at 21).

[6] Simmons and Dorio had previously worked together at the Horry County Police Department.

[7] Although Simmons informed Freeland that he had been stopped for swerving, Simmons testified that he had stopped Freeland both for failing to use a turn signal and for weaving in his lane. (Doc. 65-3, Simmons Depo., at 9-10).

to pull him over, he has conceded, and the dash cam video clearly shows, that he failed to signal when turning into his subdivision.[8]  (*Id.* at 76).

Simmons testified that, when he approached Freeland, he detected a strong odor of alcohol on Freeland's breath, and noted that Freeland's eyes were red, glassy, and bloodshot. (Doc. 28-5, Simmons Aff., at ¶ 6).  Simmons asked Freeland if he had been drinking, and Freeland admitted that he had "had a few."  (*Id.*, Exhibit C, dash cam video, at 3:54:55-3:55:27). Simmons then informed Freeland of his *Miranda* rights and requested that he perform standard field sobriety tests.  (*Id.*, Simmons Aff., at ¶ 7).

First, Simmons administered the Horizontal Gaze Nystagmus test and, according to Simmons, Freeland swayed and had nystagmus in all phases.  (*Id.* at ¶ 8).  Second, Simmons administered the Nine Step Walk and Turn.  According to Simmons, Freeland used his arms for balance, would not look at his feet, and stepped out of line several times, (*id.* at ¶ 9), and Freeland admitted stumbling during this test.  (Doc. 65-1, Freeland Depo., at 77).  Third, Simmons administered the One-Leg Stand.  Simmons observed Freeland put his foot down, use his arms for balance, and nearly fall over, (Doc. 28-5, Simmons Aff., at ¶ 10), and Freeland admitted to putting his foot down and taking a few steps back, although he claims this is because he slipped on water.  (Doc. 65-1, Freeland Depo., at 77-78).  Finally, Simmons asked Freeland to recite the portion of the alphabet from the letter "D" to the letter "U," which Freeland admits he could not successfully complete after two attempts.  (Doc. 28-5, Simmons Aff., at ¶ 11); (Doc. 65-1, Freeland Depo., at 79).  Based on Freeland's performance on all four tests,[9] Simmons

---

[8] While Freeland insists that he did not swerve, (Doc. 28-5, Exhibit D, dash cam video, at 4:16:00), during his deposition testimony, he testified only that he "would almost be certain, not one hundred percent, but I'm pretty sure I was, you know, there was no reason I needed to be pulled over that night."  (Doc. 65-1, Freeland Depo., at 69).

[9] Although not explained by any testimony in this case, these tests are commonly described as follows:

> The horizontal gaze nystagmus test measures the extent to which a person's eyes jerk as they follow an object moving from one side of the person's field of vision to the other. The test is

concluded that Freeland was intoxicated, and so he arrested Freeland and transported him to the Myrtle Beach Police Department. (Doc. 28-5, Simmons Aff., at ¶ 12).

When he arrived at the police department, Freeland refused to provide a breath sample and, therefore, he was issued a citation for driving under the influence in violation of South Carolina Code section 56-5-2930. (*Id*. at ¶ 13). Because Freeland refused to give a breath sample, his license was automatically revoked, although it was ultimately reinstated.

Freeland's DUI prosecution was handled by Lauree Richardson ("Richardson"), Assistant Solicitor for the Fifteenth Judicial Circuit. (Doc. 28-7, Richardson Aff., at ¶ 1). At the time of this prosecution, the DUI statute required the recording of the incident to "begin not later than the activation of the officer's blue lights." (*Id.* at ¶ 3). However, the video footage received by Richardson began just before Freeland performed the field sobriety tests, well after the blue lights had been activated.[10] (*Id*.). For reasons of "prosecutorial and judicial economy," Richardson decided to dismiss the charges, *nolle prosequi*. (*Id*. at ¶ 2). According to Richardson, there was never a judicial finding that Freeland was innocent of the DUI charge or that Simmons lacked probable cause for the arrest, (*id*.), but the notification of dismissal sent to the Jury Court listed the reason for dismissal as "Defendant Innocent." (*See* Doc. 38).

---

> premised on the understanding that, whereas everyone's eyes exhibit some jerking while turning to the side, when the subject is intoxicated the onset of the jerking occurs after fewer degrees of turning, and the jerking at more extreme angles becomes more distinct. The one leg stand test requires the subject to stand on one leg with the other leg extended in the air for [thirty] seconds, while counting aloud from [one] to [thirty]. The walk and turn test requires the subject to walk heel to toe along a straight line for nine paces, pivot, and then walk back heel to toe along the line for another nine paces. The subject is required to count each pace aloud from one to nine.

*Rutherford v. Cannon*, No. 8:09-2137-HMH-BHH, 2010 WL 3905386, at *2, n. 3 (D.S.C. Sept. 2, 2010) (quoting *Leibin v. Town of Avon*, No. 3:08cv266 (MRK), 2010 WL 3038100, at *2, nn. 2-4 (D. Conn. Aug. 4, 2010)).

[10] There are two dash cam videos for the night in question. The first video began when Simmons turned on the blue lights and ended after Freeland had stopped his vehicle. The second recorded the field sobriety tests. It appears that the prosecutor saw only one of these videos, although the reason for this is unknown.

6

In December 2008, Freeland filed a complaint with the Horry County Police Department's Office of Professional Standards, alleging that Dorio was having an affair with his wife, had followed him, and had him arrested so that Dorio could be with his wife. An investigation occurred, resulting in a determination that the complaint was unfounded. (Doc. 28-8, Vaught Aff., at ¶¶2-4). Freeland then filed the instant lawsuit on May 27, 2009 alleging the same general theory.

## SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure, as amended December 1, 2010, provides in relevant part that: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Amended Rule 56(c)(1) further provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Under Rule 56, the moving party bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (l986). The court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Id*. at 587. In reviewing a motion for summary judgment, a court must determine whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986).

## ANALYSIS

Freeland's Amended Complaint alleges nine causes of action. He alleges several § 1983 claims, including false arrest, malicious prosecution, due process, and interference with the right of marriage, association, and privacy. He further alleges a claim pursuant to § 1985, as well as state law claims of false arrest, malicious prosecution, civil conspiracy, and abuse of process.

Defendants move for summary judgment on several grounds, including that they are entitled to Eleventh Amendment immunity and qualified immunity. They also argue that Freeland has failed to provide evidence supporting the essential elements of his claims and, therefore, summary judgment is appropriate.

A.   **Eleventh Amendment Immunity**

Simmons argues for dismissal of all claims because he is entitled to Eleventh Amendment immunity. The Eleventh Amendment precludes a lawsuit against a State absent consent or permissible abrogation by Congress. *See Ballenger v. Owens*, 352 F.3d 842, 844 (4th Cir. 2003). A trooper with the South Carolina Highway Patrol is a state official, and thus is also immune from a lawsuit for damages filed against him in his official capacity. *Id*. at 845. However, the Eleventh Amendment provides no immunity for claims asserted against a trooper in his individual capacity. *See Smith v. Ozmint*, 394 F. Supp. 2d 787, 790-91 (D.S.C. 2005).

In this case, Freeland asserts claims against Simmons in both his official and individual capacities. (*See* Doc. 17, Amended Compl., at ¶ 4) (alleging that "[a]t all times herein relevant the aforesaid Defendants were acting in their individual as well as their official capacity").

8

Accordingly, Simmons is entitled to immunity only as to those claims asserted against him in his official capacity, not his individual capacity, and only those claims must be dismissed.

**B.     § 1983 Claims**

Freeland asserts several claims pursuant to § 1983, including claims of false arrest, malicious prosecution,[11] violation of due process, and interference with his right to marriage, association, and privacy within his marriage.

In order to establish a claim under 42 U.S.C. § 1983, a plaintiff must establish that a defendant: (1) was acting under color of state law, and (2) deprived him of rights, privileges or immunities secured by the Constitution or laws of the United States. *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011).

However, even if a plaintiff raises a triable issue as to whether a constitutional violation occurred, a defendant may still be protected by the doctrine of qualified immunity. This doctrine provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011).

Whether a defendant is entitled to qualified immunity depends on: (1) whether the plaintiff has established facts that demonstrate the defendant's conduct violated a constitutionally protected right; and, if so, (2) whether that right was clearly established such that, at the time the

---

[11] The Fourth Circuit analyzes a § 1983 malicious prosecution claim as asserting an unreasonable seizure in violation of the Fourth Amendment. *See Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000) (concluding that "there is no such thing as a '§ 1983 malicious prosecution' claim. . . . . [I]t . . . is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution"). Therefore, the analysis of a malicious prosecution claim is identical to that of the false arrest claim. *See Upchurch v. Wilkie,* No. 7:10-cv-1819-JMC-JDA, 2011 WL 3652324, at *4 (D.S.C. July 29, 2011).

act was committed, a reasonable official would have understood that his behavior violated that right. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

In the situation of a probable cause determination supporting a DUI arrest, to deny qualified immunity, a court would need to conclude that "*no* reasonably competent officer could have concluded that probable cause existed to believe [a plaintiff] was operating under the influence." *Fersner v. Prince George's Cnty., MD*, 138 F. Supp. 2d 685, 691 (D. Md. 2001) (emphasis in original).

1.    § 1983 False Arrest[12] and Malicious Prosecution Claims

Freeland's § 1983 claims for false arrest and malicious prosecution are based on his contention that Simmons lacked probable cause for the traffic stop and to arrest Freeland.[13] The Fourth Amendment protects against unreasonable seizures, and a traffic stop constitutes a seizure within the meaning of the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). As such, the traffic stop must be reasonable. *See Whren v. United States*, 517 U.S. 806, 810 (1996). A traffic stop is constitutionally reasonable when an officer either has "probable cause to believe that a traffic violation has occurred," *see id.*, or a reasonable suspicion that criminal activity may be afoot. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968).

The Fourth Amendment's prohibition against unreasonable seizures also applies to arrests, and the warrantless arrest of an individual in a public place must be supported by probable cause. *See Maryland v. Pringle*, 540 U.S. 366, 370 (2003). Evaluating whether an officer had probable cause for an arrest requires consideration of the totality of the circumstances known to the officer at the time of the arrest. *See United States v. Al-Talib*, 55 F.3d 923, 931

---

[12] Freeland's § 1983 unlawful seizure claim alleges that both the initial traffic stop and his arrest were without probable cause and thus in violation of the Fourth Amendment.

[13] Although Freeland asserts these claims against both Defendants, only Simmons initiated the traffic stop and the arrest. Dorio in no way seized Freeland. Accordingly, Simmons is the only proper defendant as to these claims.

(4th Cir. 1995). Probable cause exists when the facts known to the arresting officer "would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *United States v. Garcia*, 848 F.2d 58, 60 (4th Cir. 1988).

While probable cause requires more than mere suspicion, evidence sufficient to convict the arrestee of the offense is not required. *See Wong Sun v. United States*, 371 U.S. 471, 479 (1963). In fact, the ultimate dismissal of the charges or an acquittal does not suggest that the arrest was made without probable cause. *See Rutherford*, 2010 WL 3905386, at *6.

###### a.     **No Constitutional Violation Occurred**

In this case, no constitutional violation occurred because both the traffic stop and the arrest were proper. Simmons was justified in initiating the traffic stop because he had probable cause that Freeland had committed a traffic violation. Just prior to the traffic stop, Simmons had been notified by another officer of a potential DUI and alerted to the suspect vehicle,[14] and after Simmons began following the car, it is undisputed that Freeland failed to properly signal before turning. Failure to use a signal constitutes a traffic violation. *See* S.C. Code Ann. § 56-5-2150(a) (prohibiting turning without giving an appropriate signal). As Simmons observed this violation, he had probable cause to initiate the traffic stop for this violation, rendering the traffic stop reasonable. *See United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) (holding that "when an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment"). Accordingly, Freeland's Fourth Amendment rights were not violated by the traffic stop.

---

[14] The fact that Dorio, not Simmons, received the original DUI complaint and initially followed Freeland does not affect the reasonableness of the traffic stop. Simmons personally observed Freeland fail to use his signal, which corroborates the initial DUI complaint, which came from a known individual, Freeland's wife. *See Rutherford*, 2010 WL 3905386, at *4 (noting that when a tip came from a known individual, possessed sufficient indicia of reliability, and was corroborated by an officer's own observation, there was reasonable suspicion justifying the traffic stop). Therefore, Simmons had independently observed actions giving rise to probable cause to initiate the traffic stop.

11

Second, Simmons had probable cause to arrest Freeland for DUI. Upon approaching Freeland after the traffic stop, Simmons testified that he smelled alcohol on Freeland's breath and that Freeland's eyes were glassy and blood shot. (Doc. 28-5, Simmons Aff., at ¶ 6). Freeland also admitted he had been drinking. Furthermore, it is undisputed that Freeland made several errors while performing the field sobriety tests.[15] Specifically, during the walk-and-turn test, Freeland stumbled; during the one-leg stand test, he put his foot down and took a few steps backward; and he was unable to recite the requested portion of the alphabet after two attempts. (Doc. 65-1, Freeland Depo., at 77-79).

Therefore, when considering the totality of these circumstances, including that it was almost four o'clock in the morning, Freeland had just left a bar, he had committed a traffic violation, and he had committed errors during the field sobriety tests, a reasonable jury could only conclude that Simmons had probable cause to arrest Freeland for driving under the influence.[16] *See United States v. Gorder,* 726 F. Supp. 2d 1307, 1316 (D. Utah 2010) (concluding that the plaintiff's poor performance on field sobriety tests would have provided a reasonable officer probable cause to arrest him for DUI); *Bell v. Dir. of Revenue*, 244 S.W.3d 231, 234 (Mo. Ct. App. 2008) (finding probable cause to arrest the plaintiff of DUI when the officer received a tip regarding a possible DUI, smelled alcohol, noted bloodshot eyes, and the plaintiff performed poorly on three field sobriety tests); *Gregorie v. Goins*, No. 6:05-0822-HFF,

---

[15] Freeland disputes that he failed the tests and contends that the video of the field sobriety tests requires factual interpretation, thus creating an issue of fact for the jury. However, Freeland admits to putting his foot down, stumbling, and being unable to recite the requested portion of the alphabet after two attempts. Therefore, Freeland admits to the very errors that support Simmons's probable cause determination, and so factual interpretation of the video is unnecessary.

[16] Although the existence of probable cause is generally a question of fact that must be decided by a jury, in this case, the evidence supports only the conclusion that Simmons had probable cause to arrest Freeland, and therefore, the issue can be decided as a matter of law. *See Harkness v. City of Anderson, S.C.*, No. C.A. 8:05-1019-HMH, 2005 WL 2777574, at *3 (D.S.C. Oct. 25, 2005) (concluding that the evidence supported only the conclusion that the defendants had probable cause to make the arrest, thus denying the plaintiff's false arrest claim even though the existence of probable cause is generally a question of fact).

2007 WL 1034990, at *5 (D.S.C. Mar. 29, 2007) (concluding a reasonable jury could not disagree that an officer had probable cause to arrest a suspect when he smelled of alcohol, committed a traffic violation, and failed field sobriety tests).

Freeland's contention that the ultimate dismissal of the charges and the declaration he was "innocent" negates the probable cause is not persuasive. It is well settled that the ultimate dismissal of charges does not render the original arrest void of probable cause. *See Michigan v. DeFillippo,* 443 U.S. 31, 36 (1979). Therefore, the record demonstrates that Simmons had probable cause to initiate the traffic stop and to arrest Freeland for DUI, and Freeland's § 1983 false arrest and malicious prosecution claims must be dismissed.[17]

### b.  Not Clearly Established

Even if the Court were to conclude that a constitutional violation had occurred, Simmons would be entitled to qualified immunity because the right was not clearly established such that, at the time of the arrest, a reasonable official would have understood that his behavior violated that right. Review of the case law reveals that other reasonable officers have concluded that they had probable cause for a DUI arrest under similar facts. *See Gorder*, 726 F. Supp. 2d at 1316; *Bell*, 244 S.W.3d at 234; *Lefebvre*, 19 A.3d at 293.

Because other officers have concluded that similar facts establish probable cause for a DUI arrest, Simmons's probable cause determination was reasonable, and he is entitled to qualified immunity. *See Fersner,* 138 F. Supp. 2d at 691-92 (awarding qualified immunity after concluding that other officers could have concluded that probable cause for the arrest existed).

---

[17] Freeland argues that the dash cam video depicting Freeland driving was not provided during the criminal proceedings, and so it was not a part of the probable cause determination. However, production of the video has no relation to whether Simmons considered certain facts in his probable cause determination. Moreover, although the video does not show Freeland weaving, it does depict several other facts that support the conclusion that Simmons had probable cause for the arrest.

### 2. § 1983 Procedural Due Process Claim

Freeland also alleges a due process violation occurred pursuant to *Brady v. Maryland* when the prosecution failed to turn over certain allegedly exculpatory evidence. Under the *Brady* rule, the prosecution's failure to disclose evidence favorable to the accused constitutes a violation of due process when the evidence is material to either guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83 (1963). Accordingly, the withholding or destruction of evidence violates a criminal defendant's rights only if, as a result of these actions, the criminal defendant was denied the right to a fair trial. *See United States v. Bagley*, 473 U.S. 667, 678 (1985).

When a claim is brought pursuant to § 1983 and the criminal charges were dismissed prior to trial, "the right to a fair trial is not implicated and, therefore, no cause of action exists under § 1983." *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999) (citing *Rogala v. District of Columbia*, 161 F.3d 44, 55–56 (D.C. Cir. 1998) (per curiam); *Taylor v. Waters*, 81 F.3d 429, 435–36 & n. 5 (4th Cir. 1996); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988); *Nygren v. Predovich*, 637 F. Supp. 1083, 1087 (D. Colo. 1986)).

In this case, it is undisputed that the charges against Freeland were dismissed prior to trial. As such, even assuming the alleged violations occurred, Freeland fails to assert a cause of action pursuant to § 1983, and this claim must be dismissed.

### 3. Marriage, Association, and Privacy Claims

Freeland next asserts a claim of interference with his right to marriage, his freedom of association, and his right to privacy arguing, as the Court understands it, that Defendants conspired to arrest Freeland because Dorio was having an affair with his wife, which in turn interfered with his right to associate with his wife, his right to marriage, and to keep his marital affairs private.

To the extent that Freeland argues he was arrested for his association with his wife, and thus his freedom of association was violated, this claim fails because his arrest was supported by probable cause. *See Soto v. City of Laredo*, 764 F. Supp. 454, 456 (S.D. Tex. 1991) (concluding that "[t]he right of association does not abrogate the authority of the state to take into custody persons reasonably suspected of criminal activity").

To the extent that Freeland argues that his arrest violated his right to marriage or his right to privacy within the marriage, this argument also fails. The Constitution protects two different types of privacy interests, the "individual interest in avoiding disclosure of personal matters, and . . . the interest in the independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977). However, Freeland does not allege that Defendants either disclosed personal matters or substantially interfered with private decisions in his marital relationship.

Therefore, Freeland's claims fail as a matter of law, and Defendants are entitled to summary judgment.

**C.     § 1985 claim**

To establish a "conspiracy to deny equal protection of the laws" under §1985(3), a plaintiff must demonstrate:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). Proof of an agreement between defendants to violate a plaintiff's constitutional rights is required, and the Fourth Circuit has consistently

rejected these claims when "the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Id.* at 1377.

In this case, Freeland provides no evidence to demonstrate the existence of a conspiracy between Dorio and Simmons. Freeland points only to his allegations that Dorio and his wife were having an affair, and that Dorio and Simmons conspired to arrest Freeland so that Dorio could be alone with his wife. However, there is no evidence of this alleged affair, and more importantly, no evidence of an agreement between Dorio and Simmons to arrest Freeland. At most, the record reflects that Dorio requested assistance from Simmons and alerted him to a possible DUI in the area. However, "[w]ithout more, parallel conduct does not suggest conspiracy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) (reasoning that allegations of parallel conduct were insufficient to state a claim for a conspiracy under the Sherman Act).

As Freeland fails to provide evidence of a conspiracy, Defendants are entitled to summary judgment.[18] *See Graham v. Rosario*, No. 3:09-1535-RMG-JRM, 2010 WL 4687641, at *2 (D.S.C. Nov. 9, 2010) (granting summary judgment on a plaintiff's § 1985 claim because he failed to provide specific evidence of a conspiracy).

**D.     State Law Claims**

Freeland also asserts several state law claims, including false arrest, malicious prosecution, civil conspiracy, and abuse of process. Defendants contend they are entitled to judgment as to these claims because they are not the proper party pursuant to the South Carolina Tort Claims Act.

---

[18] Moreover, Freeland fails to allege and prove that any alleged conspiracy was motivated by "class-based, invidiously discriminatory animus." While Freeland argues that his status as a married individual is the class at issue, he fails to cite, nor did research discover, any court that has concluded an individual's status as a married individual was sufficient to satisfy this element of a § 1985 claim.

16

The South Carolina Tort Claims Act is the exclusive remedy for any tort committed by a governmental entity, its employees, or its agents. *See Flateau v. Harrelson*, 584 S.E.2d 413, 416 (S.C. Ct. App. 2003) (citing S.C. Code Ann. § 15-78-20(b)). It provides that a government employee who commits a tort while acting within the scope of his official duty is not personally liable unless the conduct was "not within the scope of his official duties or it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-70(b). When asserting claims that fall within the provisions of this Act, a plaintiff must sue the governmental entity, not the individual employee. *See Flauteu*, 584 S.E.2d at 417. Law enforcement officers of the State or its political subdivisions are protected by this Act. *See* S.C. Code Ann. § 15-78-30(c), (d).

Freeland's state law claims against Simmons and Dorio individually are barred by the South Carolina Tort Claims Act. The record does not contain any evidence on which a jury could reasonably find that Defendants were either acting outside the scope of their official duties[19] or that their actions constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude.[20] Therefore, Defendants are entitled to summary judgment as to Freeland's state law claims asserted against them in their individual capacities because Freeland has not sued the proper party.[21] *See Gregorie*, 2007 WL 1034990, *7 (dismissing state law claims as barred by the Act when the record failed to demonstrate the requisite intent to harm).

---

[19] While Freeland argues that an officer's violation of constitutional rights is outside the scope of his official duties, this argument fails because, as the Court has already concluded, Defendants did not violate Freeland's constitutional rights.

[20] Although the claims of civil conspiracy and malicious prosecution allege the intent to harm or that Defendants acted maliciously, Freeland fails to provide any evidence of this intent, and his mere allegation is insufficient at the summary judgment stage.

[21] However, these claims also fail on the merits. To establish a false arrest claim, Freeland must demonstrate that Defendants intentionally and unlawfully restrained him. *See Roberts v. City of Forest Acres*, 902 F. Supp. 662, 671 (D.S.C. 1995). Here, because Simmons had probable cause for the arrest, the restraint was not unlawful.

17

## CONCLUSION

Therefore, having heard the parties, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 28) be, and is hereby, **GRANTED**. A separate judgment shall enter concurrently herewith.

This 27th day of January, 2012.



Signed By:
William O. Bertelsman  WOB
United States District Judge

---

Also, one essential element of a malicious prosecution claim is a lack of probable cause for the prosecution. *See Guider v. Churpeyes, Inc.*, 635 S.E.2d 562, 566 (S.C. Ct. App. 2006). Here, there was probable cause for his prosecution because no intervening facts or defenses demonstrated Freeland's innocence. Accordingly, the same facts that provided probable cause for Freeland's arrest also supported his prosecution.

Next, "[a] civil conspiracy is a combination of two or more persons joining for the purpose of injuring and causing special damage to the plaintiff." *McMillan v. Oconee Mem'l Hosp., Inc.*, 626 S.E.2d 884, 886 (S.C. 2006). As pointed out above, Freeland fails to provide any evidence of an agreement between Simmons and Dorio to specially harm him.

Finally, abuse of process requires Freeland to demonstrate both an ulterior purpose and a willful act in the use of the process that is not proper in the regular course of the proceeding. *See Swicegood v. Lott*, 665 S.E.2d 211, 213-14 (S.C. Ct. App. 2008). Here, there is no proof to establish either of these elements. Therefore, Freeland's state law claims fail on the merits and must be dismissed.